## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RANDY TOLLE,                          )
                                      )
              Plaintiff,              )
                                      )        CIVIL ACTION
v.                                    )
                                      )        No. 05-2191-KHV
AMERICAN DRUG STORES, INC.            )
f/k/a OSCO DRUG, INC. and             )
ALBERTSON'S, INC.,                    )
                                      )
              Defendants.             )
                                      )
_____)

## MEMORANDUM AND ORDER

Randy Tolle filed suit against his former employer, American Drug Stores, Inc. f/k/a Osco Drug,

Inc. and Albertson's, Inc. (collectively "Osco").  Plaintiff alleges that Osco terminated his employment

because of sex and age in violation of Title VII, 42 U.S.C. § 2000e et seq.,and the Age Discrimination in

Employment Act, 29 U.S.C. § 621 et seq.  This matter is before the Court on Defendants' Motion For

Summary Judgment (Doc. #63) filed April 14, 2006.  For reasons stated below, the Court sustains Osco's

motion in part.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th

Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing

law." <u>Anderson</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see</u> <u>also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  <u>Applied Genetics</u>, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>Anderson</u>, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-52.

## **Factual Background**

Plaintiff raises a number or preliminary objections to Osco's statement of facts.  First, plaintiff

argues that the Court should strike a number of facts because Osco relies on "confidential" documents which it did not file under seal as required by the protective order in this case.  In discovery, Osco produced all of the "confidential" documents which it has submitted in support of its motion for summary judgment.  As the *disclosing party*, Osco can file documents which it marked as "confidential," without doing so under seal.  See <u>Protective Order</u> (Doc. #12) filed October 12, 2005 at 3 (confidential material will not be disclosed by any person, "except by disclosing party or parties"); <u>id.</u> at 4 (confidential material will not be used by any person, "except the disclosing party or parties," for unauthorized purpose).  Even though the protective order technically requires any party who seeks to file confidential information to seek leave to do so under seal, <u>see id.</u> at 5, such a requirement does not apply to the disclosing party because it has authority to waive the requirements of the protective order.  <u>See id.</u> at 6 (disclosing party may relieve any individual or entity from restrictions in protective order).  The "confidential" information which Osco made public does not concern particularly sensitive information.  Indeed, plaintiff primarily complains that Osco is able to submit public filings which cast plaintiff in an "extremely negative light," while plaintiff must submit certain exculpatory documents under seal.  <u>Plaintiff's Response To Summary Judgment</u> (Doc. #87) filed June 26, 2006 at 47.  Plaintiff's position is without merit.  First, plaintiff suffers no disadvantage in terms of the ruling on defendant's motion because the Court equally considers information submitted in public filings and those under seal.  Second, plaintiff cites no authority for striking defendant's statements of fact which rely on "confidential" documents.  Finally, if plaintiff wanted to file the exculpatory documents so that the public would have access to them, he should have sought leave or asked Osco for permission to do so.  <u>See</u> <u>Protective Order</u> (Doc. #12) at 6 (disclosing party or court may relieve any individual or entity from restrictions in protective order).  Instead, plaintiff sought leave to file the exculpatory documents

under seal.  See Motion For Leave To File Confidential Documents Under Seal (Doc. #68).  In these

circumstances, the Court overrules plaintiff's request to strike certain facts based on Osco's alleged

violation of the protective order.

Plaintiff next argues that the facts related to his demotion in November of 2003 are immaterial to

his claims of sex and age discrimination.  The Court disagrees.  As part of its legitimate, nondiscriminatory

reasons for terminating plaintiff's employment in November of 2004, Osco cites the fact that it counseled

and demoted plaintiff in November of 2003.  In addition, in the pretrial order, plaintiff noted that even

though he is no longer pursing a claim related to demotion, he intends to introduce evidence related to the

demotion as part of his sex and age discrimination claims.  See Pretrial Order (Doc. #66) at 1-2 n.1.

Accordingly, the facts related to plaintiff's demotion are material.[1]

Finally, plaintiff argues that because Osco produced certain documents after the close of discovery

and he can no longer authenticate or clarify those documents through depositions, Osco should be

precluded from contesting "the meaning or authenticity of documents."  Plaintiff's Response To Summary

Judgment (Doc. #87) filed June 26, 2006 at 50.  As to authenticity objections, the Court agrees and Osco

apparently does not object to this request.  On the other hand, the Court declines to adopt plaintiff's

interpretation of the "meaning" of each document.  To the extent that plaintiff thought that further depositions

---

[1]        Plaintiff argues that he did not respond to the facts related to his demotion because of the
page limitation which the Court imposed.  In the event that the Court finds that evidence is material, plaintiff
seeks leave to respond to the facts related to his demotion.  Plaintiff's Response To Summary Judgment
(Doc. #87) at 48.  Plaintiff made the strategic choice to respond to certain facts and to disregard other facts
as immaterial.  The Court declines to grant plaintiff leave to supplement his response at this late stage.  In
any event, the Court cannot envision how the outcome of the pending motion would be different if it
permitted plaintiff to supplement his response concerning his demotion.

were necessary, he should have sought a continuance under Rule 56(f), Fed. R. Civ. P. Rule 56(f) allows a party to submit an affidavit "that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition" and permits the Court to order a continuance to permit further discovery. Id. The Court has discretion whether to grant a motion under Rule 56(f). See Jensen v. Redevelopment Agency, 998 F.2d 1550, 1553-54 (10th Cir. 1993). The rule is not "invoked by the mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable." Pasternak v. Lear Petro. Explor., Inc., 790 F.2d 828, 833 (10th Cir. 1986). Plaintiff does not state with specificity how additional time would enable him to obtain evidence to oppose the motion for summary judgment. See Jensen, 998 F.2d at 1554. The Court therefore overrules plaintiff's request.

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.[2]

Plaintiff worked for Osco from May of 1977 until Osco terminated his employment in November of 2004. Plaintiff received several promotions during his employment and in 2002, Osco promoted him

---

[2]     The Court does not consider facts which the record does not support.

Plaintiff does not properly controvert many facts. For example, Osco's fact number 21 states that "Gary Hunstiger believes the people who work for him are well-versed in their areas of expertise and make sound recommendations." Plaintiff responds "Controverted that 'sound recommendations' are made. See Addl. Facts 24-81, 202-212." Plaintiff's response does not controvert Hunstiger's *belief* that his subordinates provide sound recommendations. Moreover, plaintiff's reference to additional facts of some nine pages is improper because it does not comply with D. Kan. Rule 56.1(b) (references shall be with particularity to those portions of record which non-movant relies). Plaintiff's broad references provide little aid to the Court or opposing counsel.

In response to factual statements of the movant and in setting forth additional material facts, non-movants must inform the Court what facts are most favorable to their position on summary judgment. In several instances, plaintiff does not ask the Court to adopt a particular version of the facts or explain which version is most favorable to him, and why. See Plaintiff's Response (Doc. #87) at 6, ¶¶ 79-80.

from general manager to market manager. A general manager is responsible for the operation and employees of a particular store. A market manager acts as general manager of one store and also supervises general managers of several other stores. As a market manager and general manager, Osco required plaintiff to "[s]how respect and appreciation to the entire store crew" and "be a positive role model." When plaintiff became a market manager, he reported directly to Deone Petersen, a female district manager, who has worked for Osco for 25 years.

During plaintiff's employment, Osco maintained a policy that management and supervisory associates treat all associates, customers and others with courtesy, respect and dignity at all times. See Osco's Courtesy, Dignity and Respect Policy ("Courtesy Policy"), attached as Exhibit K to Defendants' Suggestions In Support Of Defendants' Motion For Summary Judgment (Doc. #64).[3] During plaintiff's employment, Osco maintained a well-publicized policy against harassment, and plaintiff received training on the policy on multiple occasions. Osco maintained a policy that it would take appropriate action up to and including discharge when an associate had engaged in sexual harassment or inappropriate, unprofessional conduct or Osco had reasonable cause to believe that such conduct had occurred. Osco policy also provided that an associate should bring a complaint of sexual harassment to the immediate attention of the appropriate regional or corporate Human Resources (HR) manager. Osco policy provided that supervisors and management personnel should set the standards for conduct and enforce those standards by discipline and discharge if necessary.

Gary Hunstiger, regional vice president, supervised Deone Petersen from the time Hunstiger

---

[3]    The Courtesy Policy is "sort of a moral code" and pertains to "subjective things." Sullivan Depo. at 163; Crosby Depo. at 97-98.

became regional vice president on April 21, 2002 until November of 2004 when Deone Petersen changed jobs.[4]  Hunstiger is 57 years old, with 42 years of service with Osco and related entities.  Hunstiger currently supervises seven district managers: Curt Larson (age 58), Darryl Schatz (age 50), Richard Hayes (age 45), James Larson (age 44), Stan Petersen (age 56), Jake Jackson (age 56) and Ron Cardarelli (age 54).  Hunstiger reports to Dennis Palmer,  who is 57 years old and is the regional executive vice president.

Hunstiger makes discipline and termination decisions about general managers in his region, which includes more than 166 stores in 12 states.  In doing so, Hunstiger receives input from district managers and personnel in the loss prevention (LP), HR and legal departments.  Hunstiger believes that those associates who report to him make sound recommendations.  Hunstiger cannot recall disagreeing with a recommendation to terminate someone's employment.  As a district manager, Deone Petersen did not have authority to terminate the employment of general managers in her district.[5]  District managers, however, ordinarily initiate employment decisions regarding market and general managers by providing recommendations to HR and then to Hunstiger.

---

[4]     Bill Bates was the prior regional vice president, but he retired in early 2002.  The position was vacant for approximately one month before Hunstiger took over the position.

[5]     Plaintiff maintains that Deone Petersen had authority to terminate his employment, but he cites only the deposition of her administrative assistant, Barbara Bell.  See Plaintiff's Response (Doc. #87) at 31, ¶ 166.  Bell testified that because of Deone Petersen's position as district manager, she believed that Deone Petersen had authority to terminate the employment of general managers who reported to her.  See Bell Depo. at 120 (belief based solely on fact that general managers report to district manager); id. at 60 (knowledge of terminations based solely on rumor mill and after-the-fact conversations).  In light of the affidavits and testimony of Deone Petersen, Hunstiger, Sandy Zubik (from Osco legal department) and Dwight Crosby (from Osco loss prevention department), however, a reasonable jury could not conclude that Deone Petersen had authority to terminate the employment of a general manager.  See, e.g., Crosby Depo. at 16.

For 2001, 2002 and 2003, Deone Petersen completed plaintiff's annual performance appraisal and gave him overall ratings of "meets expectations." In 2001, plaintiff signed the appraisal and noted that he thought the appraisal was an accurate reflection of his performance. In 2002, plaintiff signed the appraisal and noted that he thought the appraisal reflected his own thoughts on his abilities and accomplishments from that year. In 2003, plaintiff signed the appraisal but did not note any comments.

## I.   Plaintiff's Demotion To General Manager

As market manager, in November of 2003, plaintiff supervised three general managers: Rich Malone, Warren Koch and Jerry Young. Plaintiff also oversaw the store at 81st and State Avenue in Kansas City, Kansas. In November of 2003, through reports of a union grievance, an employee complaint, and concerns expressed by Koch, Osco learned of dissatisfaction regarding plaintiff's treatment of subordinates. Osco's LP department interviewed the complainants. Deone Petersen also spoke about plaintiff with Koch, Malone and Young.

Employees accused plaintiff of being "chauvinistic," "rude" and "demeaning to women." Hunstiger recalls that plaintiff did not treat people well, in his store or in his market. Hunstiger decided to demote and move plaintiff to the store at College and Quivira in Overland Park, Kansas, because he wanted plaintiff out of harm's way and wanted to give him an opportunity to change his behavior. Hunstiger also told plaintiff to attend a behavioral school.

Hunstiger told Deone Petersen that plaintiff could not return to the store and later told her that Betty Soller would take over plaintiff's responsibilities at the store. Soller testified that it was a lateral move, but her personnel file reflects that the transfer was a promotion.

In November of 2003, Deone Petersen and Joe Egan, an associate in the LP department, notified

8

plaintiff that he was being demoted to general manager.  Five or six days later, plaintiff received a Corrective Action Associate Review ("CAAR") which stated that he was demoted because of a hostile work environment and violation of the Courtesy Policy.  The CAAR indicated that it was a final written warning, which plaintiff understood to mean that if a similar situation arose, his employment would be terminated.

Before his demotion, plaintiff was one of five market managers supervised by Deone Petersen. Tom Adams (age 54), Betty Soller (age 43), Damon Shilhanek (age 47) and Mark Western (age 48) were the four others.  After plaintiff's demotion, he reported directly to Adams.  Osco did not replace plaintiff as market manager; other market managers absorbed his previous responsibilities.

In April of 2004, plaintiff attempted to schedule the behavioral class with Dana Bauer in HR. Plaintiff sent Bauer an e-mail with a list of three possible dates: July 10, August 7 and October 9.  Bauer responded that she would try to register plaintiff for the class on July 10 and that she would inform him as soon as she received confirmation.  Bauer did not follow up with plaintiff.  Hunstiger testified that he was not aware of plaintiff's e-mail to Bauer and does not know whether plaintiff ever attended the class.

## II.    Investigation Of Plaintiff And Termination Of His Employment

In September of 2004, plaintiff oversaw two managers: Joyce Barker, operations manager, and Susan Manley, assistant manager.  Barker acknowledged teasing plaintiff "about being an old guy, getting tired easily, general joking around that goes on in the workplace."  Barker was plaintiff's subordinate and plaintiff never complained about Barker's teasing.  On September 28 or 29, 2004, Osco held an assistant managers' meeting at which Barker approached Deone Petersen and expressed concerns about plaintiff's management.  In particular, Barker stated that she had to be at work at 6:00 a.m., which caused a conflict

with day care for her children.  Barker also shared concerns about plaintiff's treatment of Manley.[6]  Deone Petersen asked Barker to put her concerns in writing and provide them to her.  Barker typed a statement that evening and delivered it to the district office on September 30 or October 1.

Following the meeting, Deone Petersen told Hunstiger and Sandy Hoscheit, regional HR manager, of associate concerns about plaintiff's treatment of subordinates.  Hunstiger testified that he was very disappointed because plaintiff did not take heed of counseling which Osco had provided him.

On September 30, 2004, Hunstiger sent Deone Petersen and Hoscheit the following e-mail with the subject line "Randy's Class:"

> I talked to Dana [Bauer] tonite.  She had intended to have Randy go to this Behavioral School in October as there was some issue with him going in June.  Dana was to set up the class but rest assured Randy will never bring it up!
> Let's move forward with the associate survey and see what we get.

Later that day, Deone Petersen responded as follows:

> Thanks for the information.
> Gary.  I will work with Steve and Dwight on the surveys tomorrow [for plaintiff].
> [Steve and Dwight] will be talking to Rich Malone tomorrow afternoon to determine a dollar amount for the destroyed product over the past week/months.  Dwight found a total of $2500 in product yesterday . . .

Early the next morning, on October 1, 2004, Hunstiger responded by stating "[k]eep me posted.  As discussed, termination will likely be our determination."  The above e-mail chain was included in plaintiff's personnel file, but Hunstiger testified that the reference to termination referred to Malone, not plaintiff.

Osco does not often use associate surveys to elicit information about problems with store

---

[6]     Osco moved Manley out of plaintiff's store in late September or early October to work in a new store.  No evidence suggests that Manley's transfer was related to Barker's complaint to Deone Petersen.

management.  Sullivan was not provided any associate surveys that were returned, and he was not told that they contained positive comments about plaintiff.  Osco has not explained how, if at all, the surveys were used or who reviewed them.

On October 14, 2004, Barker spoke with Deone Petersen about an issue between plaintiff and associate Kristi West.  Deone Petersen notified Hoscheit who contacted Barker and asked her to obtain a written statement from West.  Deone Peterson also asked Barker to give a statement about the incident and any related concerns.  Barker obtained a statement from West and faxed it to Hoscheit.  Barker also prepared her own statements, which she faxed to Hoscheit.

On October 20, 2004, Deone Petersen visited plaintiff's store.  Barker testified that she had never had a visit like that before and that Deone Petersen "criticized everything we did."  At the time of the visit, Barker had been in contact with Deone Petersen about issues with plaintiff, but Barker did not think that the issues were connected to the visit.

On October 23, 2004, plaintiff conducted a new associate orientation where he reviewed policies with new associates and had them sign certain documents at the district office.  Sullivan testified that he did not think it was odd that plaintiff conducted the orientation while he was under investigation for a hostile work environment and violating Osco's Courtesy Policy.

Hoscheit directed LP to conduct interviews of several employees who had expressed concerns about plaintiff's conduct.  Dwight Crosby, a male employee from LP, interviewed Manley and Barker and obtained statements from them.[7]  Another employee from LP obtained a statement from Janet Rhodes.

---

[7]    LP asked Manley to write down her complaints about plaintiff.  Manley agreed that her
(continued...)

11

LP then provided the three statements to Hoscheit.  After reviewing the statements, Hoscheit directed LP to interview plaintiff.[8]

Steve Sullivan from LP received the employee statements and on October 29, 2004, he met with plaintiff for some two hours to discuss the alleged incidents involving plaintiff and other associates.[9]  Sullivan noted that plaintiff's attitude was very good during the meeting.  Sullivan prepared a report which reflected his understanding of the incidents which he discussed with plaintiff:

> a.   On one occasion Plaintiff was heard to say to Assistant Manager Susan Manley, "Sit down and act like an Assistant Manager and make it right."

> b.   On one occasion, Plaintiff was heard to state to Operating Manager Joyce Barker, "I hope they give me a guy that can break down pallets."[10]

---

[7](...continued)

statement looks like a laundry list of negative information about plaintiff.  Manley understood that LP was not interested in hearing positive things about plaintiff, but she testified that she would have given the same statement even if LP had asked her to give an objective one.

Barker initially went to Deone Petersen about her childcare issue.  Barker feels that plaintiff created a hostile work environment after her husband went to work by refusing to work with her on this issue. Barker's statements identify problems she had with plaintiff, and her statements are not an accurate reflection of her entire working relationship with plaintiff.  Deone Petersen, Hoscheit and Crosby did not ask Barker for a general assessment of her working relationship with plaintiff.

Deone Petersen never offered any positive information about plaintiff in the investigation.

[8]   Although the complaining employees mentioned employees named Ty, Ben and Brandon, Sullivan does not recall that they were interviewed.  In any event, except for plaintiff's statement, Osco did not obtain a statement from any male employee.

[9]   Plaintiff told Sullivan about some complaints to the Osco Complaint Center including an anonymous complaint from Shawnee Mission, Kansas which raised the same issue Deone Petersen had raised with plaintiff and Barker some three days earlier.  Deone Petersen has a house in Shawnee Mission, Kansas, but she testified that it was just coincidence that she and the anonymous customer had the same concern.

[10]   Dick Miller stated that during his time as market manager, the company had difficulty hiring

(continued...)

12

    c.       On one occasion he was heard to state, "I hope she wasn't stupid and thrown [sic] them away," to Barker about Manley.

    d.       Discipline was not administered to an associate that had yelled and cursed at Barker.

    e.       On one occasion he was heard to state in the presence of Supervisor Janet Rhodes, "We need to get some male help around here."

    f.       On 10/14/04, he was heard to state to Kristi West, "Guys can work back here, but you need to work on the first pallet out in the aisle," when West offered to work on the warehouse in the backroom.

    g.       A customer complaint in regards [sic] to the rude manner in which plaintiff dealt with his associates.[11]

Sullivan discussed with plaintiff the importance of not retaliating against employees who made complaints against him. During their meeting, plaintiff did not believe that Sullivan was counseling him because of his age or gender. Sullivan asked plaintiff to provide a written response that evening, and plaintiff e-mailed his

_____

[10](...continued)

male employees to work during the day. Dick Miller stated that because of the challenge of scheduling around childcare and the fact that some daily tasks were more conducive to performance by male employees, general managers and other executives commonly talked about the challenge of having primarily female employees during the day. Barker agreed that male employees ordinarily performed certain tasks such as making cardboard bales and unloading trucks. Dick Miller did not think that these discussions created a hostile work environment or violated any Osco policy. When Sullivan heard comments by managers about the difficulty in hiring male employees, he does not think that he was ever concerned about such comments because of their context.

[11]      Sullivan agrees that based on his understanding of the company's sexual harassment policy, plaintiff did not violate the policy by his "gender comments." Sullivan testified that he is not in a position to determine HR issues, but that in his experience, his report by itself would be insufficient to terminate the employment of an associate. Also, Manley did not feel that her complaints were sufficient to terminate plaintiff's employment.

    In putting together his report, Sullivan used statements from complaining parties that he did not interview himself, and he had not checked to see who had obtained the statements. Typically, Sullivan would obtain the statements himself.

response later that evening.

Plaintiff gave a detailed response to the allegations.  In summary form, plaintiff stated as follows:

1)  Sit down, act like an assistant manager and make it right (involving sale of plants)
Plaintiff explained that he and Barker talked to Manley about the pricing of plants and he told Manley that she was an assistant manager and that she needed to and could make things right.  After the exchange, Barker told plaintiff that Manley was under a lot of stress and maybe felt like plaintiff thought that she could not do her job.

2) Associates getting by with a lot; upsetting customers; throwing away or destroying company property
Plaintiff denied that he had ever discussed throwing away company property with anyone. He said that in many locations, some associates felt that other associates could get by with a lot.

3) "I hope they give me a guy that can break down pallets."
Plaintiff explained that he and Barker commented that they needed to get the Thursday warehouse guy back so that they did not have to break down the pallets themselves.

4) Referring to the AM - "I hope she was not stupid and thrown them away."
Plaintiff denied that he ever used the word stupid or inferred that the assistant manager was stupid.

5)  Ben yelling and cursing at Barker; plaintiff not doing anything about it.
Plaintiff explained that he agreed with Barker's proposed discipline of the associate, but plaintiff told Barker to wait and make sure that the associate showed up for work again. Plaintiff stated that he and Barker did not discipline the associate because the associate never came back to work.

6) "We have to get some male help around here."
Plaintiff responded that this comment must have been in reference to trying to get the Thursday warehouse guy back and that he never stated that they needed more males except that he did not want to have his assistants breaking down warehouse loads, or do so himself.

7) "Guys can work back here but you need to work on the first pallet in the aisle."
Plaintiff responded that he had at least one female associate break down a pallet in the aisle, but that he did so because the driver of the load was unloading in the back room.

14

8) <u>Customer complaint about plaintiff's surly attitude and an associate's break and scheduling issues</u>

Plaintiff responded that the customers must have been friends of an associate who came in and tried to use the associate's employee discount. As to the scheduling issue, plaintiff responded that he explained to the associate that he had reported the scheduling conflict to Manley shortly after the associate had been hired, and plaintiff did not realize that the associate had any scheduling problem until that day. As to breaks for the associate, plaintiff stated that he was never aware that the associate had any medical concerns or special needs.

Sullivan believes that in some form, plaintiff's statement admitted some of the allegations.

On October 30, the day after plaintiff e-mailed his statement to Sullivan, plaintiff forwarded it to the management shared e-mail in-box. Plaintiff did so because he did not know how to print a copy of a sent message on the new e-mail system and he wanted to retain a copy of his response. Plaintiff knew that Barker had access to the shared in-box and that she had made a complaint about him. The next day, with help from Adams, plaintiff printed a copy of his e-mail. Plaintiff believes that he then deleted the e-mail from the shared in-box.

On November 1, 2004, Barker contacted Deone Petersen and Sullivan because of her concern about plaintiff's e-mail, which she had discovered in the shared in-box. Barker told them that she was nervous about the e-mail, that she thought that plaintiff put it there to intimidate her, and that because of it, she did not want to go to work that day. Deone Petersen and Sullivan told Barker that she needed to go to work and "ignore it like it never happened." Deone Petersen and Sullivan asked Barker to provide a written statement, which Barker prepared and delivered to the district office. Barker explained to Sullivan that plaintiff's statement was not accurate.

Deone Petersen understood that plaintiff had an explanation why his response was in Barker's e-mail box (<u>i.e.</u> to print out the e-mail), but she did not believe it. Deone Petersen did not recall that anyone

else had this problem with the new e-mail system.

On November 3, 2004, Sullivan met plaintiff at the district office and gave him the e-mail which Barker had received.  Sullivan told plaintiff that plaintiff would be leaving the store.  During the meeting on November 3, Sullivan described plaintiff as calm and "sorry about the situation."  Sullivan asked plaintiff to prepare a statement about the alleged retaliation.  Following the meeting with Sullivan, but before leaving the district office that day, plaintiff wrote out a statement responding to Sullivan's questions.  The statement read in part:

> Joyce [Barker] and I had numerous discussions about wanting a guy to help on the warehouse loads.
>
> When I saw the statement [which I sent to Sullivan] on the [shared] e-mail [box] Monday I realized I had made a serious error.  I would understand Steve's statement regarding my intimidation [of Barker] but never was I attempting to do so.

From Hoscheit, Hunstiger received periodic updates throughout the 2004 investigation of plaintiff. Hunstiger eventually decided to terminate plaintiff's employment.  In doing so, Hunstiger considered the information which he had received from Hoscheit, Sullivan, Deone Petersen and Sandy Zubik from Osco's legal department.[12]  In particular, Hunstiger considered information about the allegations against plaintiff in 2004, plaintiff's responses to those allegations, and the circumstances of plaintiff's demotion and final

---

[12]     Hunstiger testified if a district manager had an issue with a general manager, the district manager generally would talk to the market manager about the issue.  Dick Miller, who retired as a general manager in 2000, testified that in his experience, market managers were always involved in the terminations of general managers and it would be unusual for a general manager to be terminated without input or involvement by the market manager.  When asked why Adams was not involved in any of the issues with plaintiff, and why the market manager would be skipped, Deone Petersen responded that if Barker did not feel comfortable going to Adams, "then she knows that she can come to me, she could call HR, she could call the 1-800 hotline for associates."

written warning in November 2003.  Hunstiger directed Deone Petersen to inform plaintiff that Osco had terminated his employment.

On November 4, 2004, Osco informed plaintiff, who was 51 years old, that it was terminating his employment for creating a hostile work environment and violating its Courtesy Policy.[13]  See CAAR dated November 4, 2004 (identifying employment problem as hostile work environment and violation of Courtesy Policy), attached as Exhibit U-41 to Plaintiff's Response (Doc. #73).  The CAAR did not specifically reflect how plaintiff created a hostile work environment or violated the Courtesy Policy, or cite plaintiff's e-mail as a basis for discharge.  Zubik testified that the decision to terminate plaintiff's employment was made after they talked to him a second time, and that because of plaintiff's failure to delete the e-mail which Barker received, Zubik "thought he was a liability to our company."

During the investigation of plaintiff in 2004, plaintiff remained at his store with the employees (except Manley) who had complained about him.  Osco did not address whether plaintiff should be removed from the store pending the investigation.  Sullivan testified that employees are typically separated in cases of physical threats, but he did not know of any policy which required separation when a hostile work environment was alleged.

On November 15, 2004, Hoscheit's assistant sent Deone Petersen the following e-mail:

------------------------------------

[13]     Since Hunstiger became regional vice president in March of 2002, no other general manager in the region, male or female, has received a final written warning for violating Osco's harassment policy and/or Courtesy Policy, and subsequently engaged in the same conduct for which the final warning was issued.

Even though retail associates often feel uncomfortable, Deone Petersen testified that her understanding of a hostile work environment was associates feeling uncomfortable.  When asked how plaintiff created a hostile work environment, Deone Petersen testified that she was not part of the decision as to plaintiff, but that others made and communicated the decision to her.

Deone, I spoke with Eugene Parsons of UC Express. Eugene indicated that he needs by noon today very specific details of the reason for Randy's term, witness statements, investigations done, copy of the company policy that the claimant violated, claimant signed acknowledgment of the policy, prior written warnings on same matter.

Deone Petersen did not know why HR would be asking her for witness statements and a copy of the company policy plaintiff violated when, as she testified, HR completed all this information. Hunstiger also had no idea why HR would request such information from Deone Petersen.

When asked about plaintiff's unemployment form, Deone Petersen testified that she completed the form off the CAAR forms which plaintiff had received. She testified, however, that she must have omitted "hostile work environment" from the unemployment form and that this was odd. When asked about the discrepancy, Deone Petersen testified: "Randy was still terminated for violation of company policy."

## III.    Transfer Of Mary Johnson

On September 19 or 20, 2004, Mary Johnson, a general manager of a store in Columbia, Missouri, learned that her store would be closing. Deone Petersen and Hunstiger wanted Johnson to stay with Osco. Deone Petersen testified she told Johnson that she could come to Kansas City and co-manage a store until something in the area opened up.[14]  Hunstiger testified that Osco planned to put Johnson wherever Osco "had something for her to work on until such time as a store opened."

Before plaintiff knew that Osco was investigating him, Johnson and her husband went to his store on a Friday evening and appeared to be looking around. That evening, Johnson told plaintiff that she did not know where she was going but that she had been told to look for a house in south Johnson County.

---

[14]    Bell understood that the salaries of both co-general managers would come out of the one store budget and therefore the potential bonus of the management team would be reduced at that store. Deone Petersen understood that Johnson would not want to co-manage for the rest of her career.

Johnson testified that it was pure happenstance that she went into plaintiff's store on that occasion, and that she and her husband were staying at a local hotel.

On October 27, 2004, Johnson's real estate agent understood that Johnson would remain in Columbia through November 12. On November 2, before she knew if and where Osco had a job for her, Johnson signed a contract to purchase a house in Olathe, Kansas.[15] Johnson did not have any reservation about doing so because Hunstiger and his boss had told her that they would find a place for her in the Kansas City area. On November 4, 2004, Johnson listed her home in Columbia for sale.

Even though Barker had told Johnson of problems at plaintiff's store and even though Johnson had gone into plaintiff's store while he was still there, Johnson denied knowing that plaintiff's store might be the store where she would end up. According to Johnson, she "had no idea what was going on in that situation." Bell testified that Deone Petersen decided to move Johnson to plaintiff's store.

Osco did not hire a new general manager to replace plaintiff. Effective November 13, 2004, however, Osco transferred Johnson to plaintiff's store as a general manager. Plaintiff had 18 years experience as a general manager, while Johnson had only five years of experience in that position. Johnson understood that she was being transferred because the store needed a general manager but she agreed the HR document stated that the change was due to the store closing in Columbia. When asked about the timing of the store closing and plaintiff's termination, Hunstiger, Deone Petersen and Johnson testified it was simply coincidental. Hunstiger testified that the decision to move Johnson to plaintiff's store was made after plaintiff's termination.

---

[15]    The contract was subject to Johnson's approval of the home after a second visit on November 5, 2004.

IV.    **Diversity In Osco Management**

Before Osco terminated plaintiff's employment, Deone Petersen's district had 13 male general managers and 5 female general managers.  From 2000 through 2004, in Deone Petersen's district, Osco terminated the employment of the following general managers, all of whom were male: Bruce Waggoner (age 53), Brian Redmond (age 44), Brad Shumway (age 41), Steve Lowrey (age 32), Richard Malone (age 51), Rayburn Mayfield (age 58), Greg Koehler (age 40) and plaintiff (age 51).  The average age of these general managers, when they were terminated, was 46.25.

In July of 2003, Palmer noted that Hunstiger had perhaps the most diverse staff of one African American, one female and one male.  Palmer gave Hunstiger the following goal for 2003: "Develop at least two [district manager] ready females, and two [district manager] ready minorities.  Continue to improve diversity scorecard at store and district level."

In 2003 and 2004, Hunstiger encouraged Deone Petersen to "get the pipeline filled" with females and minorities.  In October of 2003, Hunstiger noted that Deone Petersen's district had ten promotions in the first part of the year and that two were minorities and three were female.  In March of 2004, Hunstiger noted that in Deone Petersen's district, 40 per cent of the promotions were females and 20 per cent were minorities, but that Deone Petersen should continue to work on building the diversity pool.

Deone Petersen, Soller and Johnson are members and officers of a group for women in management which is committed to mentoring, encouraging, supporting and achieving ("M.E.S.A.").  Deone Petersen and Soller started the Kansas City Chapter of M.E.S.A.  The M.E.S.A newsletter for October of 2005 notes that Larry Johnson, Osco's Chief Operating Officer, stated as follows: "We value diversity and wish to create an environment at every level of the company that mirrors our customer base.

This is important to me, especially when 85 percent of the purchases in my stores are made by women." Osco attempts to staff stores to reflect its diverse customer base, "whether it is female, African American male, Hispanic female, [or] any [category] other than white male."

Management terminations at Osco are rare. In the past ten years, Deone Petersen has not been involved in the termination of a female management employee and she has not recommended or requested the resignation of a female general manager. No female general manager has been terminated in Hunstiger's district since he took over in April of 2002.

Deone Petersen had a romantic relationship with another manager, Stan Petersen, while they worked together at the district office and were married to other people. They later divorced their prior spouses and married each other. Bell and other employees were uncomfortable about the relationship. Bell and Teresa Caster, a former regional pharmacy manager, thought that the relationship created a hostile work environment and violated Osco's Courtesy Policy. Sullivan agreed that if the affair made associates feel uncomfortable, it could violate the Osco policy. At some point, Stan Petersen reported to Bill Bates, the area vice president, that he and Deone were romantically involved. Bates told Stan Petersen that HR knew of this fact and that the company supported them. Osco did not conduct any investigation to determine whether others were uncomfortable with the relationship between the two.

Brad Shumway, a former general manager in Deone Petersen's district, stated that auditing the management schedule is a common way for Osco to get rid of managers when it has no other reason for termination. On August 7, 2000, Osco terminated Shumway's employment because he had allegedly

21

violated Osco policy by falsifying a management schedule two months earlier.[16]   Some three days before

Osco terminated Shumway's employment, Osco decided to replace him with Jeff Miller, the general

manager of a store in St. Joseph, Missouri which had closed on July 15, 2000.[17]   Jeff Miller, who was 32

years old at the time, needed a store to manage.

**V.      Lawsuit**

On May 11, 2005, plaintiff filed suit against Osco, alleging that it terminated his employment

because of his sex and age in violation of Title VII, 42 U.S.C. § 2000e et seq., and the Age Discrimination

in Employment Act, 29 U.S.C. § 621 et seq.

Other than her management decisions, Deone Petersen never said anything to plaintiff or

demonstrated any conduct based on age that plaintiff believes was inappropriate.  Also, other than her

management decisions and a single comment in November of 2001, Deone Petersen did not engage in any

conduct based on gender which plaintiff felt was inappropriate.[18]

Plaintiff has no reason to believe that Hunstiger had any intent to discriminate against him on the

basis of age or gender.  Plaintiff also has no reason to believe that associates did not actually complain

---

[16]      Dick Miller, a retired market manager who was employed through February 1, 2000, testified that Deone Petersen unfairly criticized Shumway.  In one instance, Deone Petersen required Dick Miller to discipline Shumway for not working his scheduled hours even though Dick Miller felt that Shumway had not done anything wrong.  Dick Miller testified that in his opinion, in Deone Petersen's eyes, women associates could do no wrong.

[17]      Sandy Zubik's notes on Shumway, dated August 1, 2000, state that "[w]e need to get rid of him;" "get Alarm Records & compare to those schedules (go back a little ways);" "(not just a vacation slow time issue);" "ME Rating;" and "no other discipline in his file."

[18]      In November of 2001, Tom Adams had said, "I don't think yours is bigger than mine." Deone Petersen said, "Well, that's okay you're among friends."  Plaintiff does not recall what any of them were talking about.

22

about him.

Before "probably October 29, 2004," plaintiff did not believe that Osco acted because of his age or gender. As of November 30, 2005, plaintiff believed that Deone Petersen was the only person who had discriminated against him on the basis of age or gender.

Osco seeks summary judgment on plaintiff's claims of sex and age discrimination. Osco argues that plaintiff cannot establish a prima facie case on either claim and that in the alternative, plaintiff has not presented sufficient evidence for a reasonable jury to find that Osco's legitimate, nondiscriminatory reasons for termination are a pretext for sex or age discrimination.

## Analysis

### I.    Sex Discrimination Claim

Plaintiff claims that defendant terminated his employment because of sex in violation of Title VII. See 42 U.S.C. § 2000e-2(a)(1). Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court applies a disparate treatment analysis to claims that an employer treats some people less favorably because of race, color, religion, sex or national origin. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). To prevail on his disparate treatment claim under Title VII, plaintiff must show that the alleged discrimination was intentional. Plaintiff may establish discriminatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden shifting method known as the McDonnell Douglas test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 824 (1973).

For purposes of Osco's motion, the Court finds that plaintiff has not presented direct evidence of

23

discrimination.  Direct evidence includes "evidence, which if believed, proves the existence of a fact in issue without inference or presumption." Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999) (citations omitted).  Direct evidence must "speak directly to the issue of discriminatory intent" and must "relate to the specific employment decision in question." Swanson v. Allied Signal, Inc., No. 91-2155-L, 1992 WL 223768, at *2 (D. Kan. Aug. 13, 1992).  Statements of personal opinion and statements by an employee other than an actual decision-maker do not constitute direct evidence of discrimination.  Shorter, 188 F.3d at 1207; Ramsey v. City & County of Denver, 907 F.2d 1004, 1007 (10th Cir. 1990), cert. denied, 506 U.S. 907 (1992); Weber v. United Parcel Serv., No. 91-1225-MLB, 1993 WL 245969, at *5 (D. Kan. June 16, 1993).

Because he relies upon indirect evidence, plaintiff's claim of sex discrimination is subject to the familiar three-step McDonnell Douglas analytical framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under the burden-shifting framework of McDonnell Douglas, 411 U.S. at 802-04, plaintiff has the initial burden of establishing a prima facie case of sex discrimination in his employment termination.  Plaintiff satisfies this burden by presenting a scenario which on its face suggests that defendant more likely than not discriminated against him.  See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  A plaintiff ordinarily may make a prima facie case by showing that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002).

If plaintiff can establish a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for his termination.  See Nulf v. Int'l Paper Co., 656 F.2d 553, 558 (10th Cir.

1981).  After defendant does so, the burden then shifts back to the plaintiff to show that the stated reason is pretextual.

In a reverse discrimination case, a different standard is applied because the Court cannot presume discrimination against historically favored litigants in the event of adverse employment actions.  See Livingston v. Roadway Exp., Inc., 802 F.2d 1250, 1253 (10th Cir. 1986).  In such a case, in lieu of showing that he belongs to a protected class, a plaintiff must present evidence of background circumstances which supports an inference that defendant is an unusual employer which discriminates against the majority. Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992).  Alternatively, plaintiff may produce indirect evidence "sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred."  Id. at 590.

Defendant argues that plaintiff cannot present sufficient evidence (1) that Osco is one of those unusual employers which discriminates against the majority or (2) that but for plaintiff's sex, Osco would not have terminated his employment.  Plaintiff, however, has produced the following evidence:

1.   In July of 2003, Palmer noted that Hunstiger had perhaps the most diverse staff. Palmer gave Hunstiger the following goal for 2003: "Develop at least two [district manager] ready females, and two [district manager] ready minorities.  Continue to improve diversity scorecard at store and district level."

2.   In 2003 and 2004, Hunstiger encouraged Deone Petersen to "get the pipeline filled" with females and minorities.  In October of 2003, Hunstiger noted that Deone Petersen's district had ten promotions in the first part of the year and that two were minority employees and three were female employees.  In March of 2004, Hunstiger noted that in Deone Petersen's district, 40 per cent of the promotions were female employees and 20 per cent were minority employees, but that Deone Petersen should continue to work on building the diversity pool.

3.   In 2005, Osco's Chief Operating Officer, stated as follows: "We value diversity and wish to create an environment at every level of the company that mirrors our

customer base.  This is important to me, especially when 85 percent of the purchases in my stores are made by women."  Osco attempts to staff stores to reflect its diverse customer base, whether it is female, African American male, Hispanic female, or any category other than white male.

4.   In the past ten years, Deone Petersen has not been involved in terminating a female management employee and she has not recommended or requested the resignation of a female general manager.  On the other hand, from 2000 through 2004, Osco has terminated the employment of eight male general managers in her district.  No female general manager has been terminated in Hunstiger's district since he took over in April of 2002.

Such background circumstances are sufficient to support an inference that Osco is one of those unusual employers which discriminates against the majority.  See Notari, 971 F.2d at 589.  While this evidence is not conclusive, it allows plaintiff to establish a prima facie case of reverse sex discrimination.

Osco asserts that it terminated plaintiff's employment because (1) he violated the Courtesy Policy in 2003 and 2004 and (2) he create a hostile work environment in 2004.  Defendant has met its burden to articulate a facially nondiscriminatory reason for terminating plaintiff's employment.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1229-30 (10th Cir. 2000).

Under the third step of McDonnell Douglas, the burden shifts back to plaintiff to show that defendant's stated reasons for termination are a pretext for sex discrimination.  Id. at 1230; Randle v. City of Aurora, 69 F .3d 441, 451 (10th Cir. 1995).  Defendant asserts that it is entitled to summary judgment because plaintiff has produced no evidence from which a jury could conclude that the real reason for terminating his employment was sex.  The relevant issue is not whether the stated reasons for termination were wise, fair or correct but whether defendant honestly believed in those reasons and acted in good faith.  Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004).  In examining this issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."  Kendrick, 220 F.3d

at 1231.  The Court's role is not to second guess an employer's business judgment.  Stover, 382 F.3d at

1076.

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact finder could rationally find them unworthy of credence."  Morgan v. Hilti, Inc., 108 F.3d

1319, 1323 (10th Cir. 1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not

empty or perfunctory."  Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three

ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e.

unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the

action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten

policy or contrary to company practice when making the adverse employment decision affecting plaintiff.

Kendrick, 220 F.3d at 1230.  More specifically, evidence of pretext may include "prior treatment of

plaintiff; the employer's policy and practice regarding minority employment (including statistical data);

disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective

criteria."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328

(10th Cir.), cert. denied, 528 U.S. 815 (1999).

Plaintiff's strongest evidence of pretext is Osco's general policy and practice of trying to hire and

promote women to reflect its customer base of some 85 per cent women.  Viewing the evidence in the light

most favorable to plaintiff, a reasonable jury could also find that (1) Osco decided to replace plaintiff with

a woman (Johnson) before it even completed its investigation of the complaints against plaintiff; (2) Osco

did not truly believe that the complaints of hostile work environment were sufficiently serious to warrant

dismissal because it did not separate plaintiff and the complainants during the investigation; (3) Osco management commonly talked about the difficulty in hiring male employees for day shifts; (4) Osco did not discipline or even investigate the affair between Deone Peterson and Stan Peterson, which potentially violated Osco's Courtesy Policy; and (5) because it did not involve plaintiff's market manager (Adams) in the investigation, Osco did not follow its normal procedure in investigating the complaints against plaintiff. In these circumstances, a reasonable jury could find that defendant conducted a sham investigation and that the stated reasons for termination were false. Accordingly, the Court overrules defendant's motion for summary judgment on plaintiff's claim that Osco terminated his employment because of sex.

## II.     Age Discrimination Claim

Defendant argues that it is entitled to summary judgment on plaintiff's age discrimination claim because plaintiff cannot establish a prima facie case. Generally, to establish a prima facie case of age discrimination in termination, plaintiff must show that (1) he was a member of the protected age group (over age 40); (2) he was doing satisfactory work; (3) he suffered an adverse employment action; and (4) defendant filled his position with a substantially younger person. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308 (1996); Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).[19] Defendant contends

―――――――――――――――――

[19]     In O'Connor, the Supreme Court noted that to establish a prima facie case of age discrimination, plaintiff must produce evidence sufficient to create an inference that defendant based its employment decision on age. See id. at 312. With respect to the fourth element, the Supreme Court held that plaintiff need not show that defendant replaced him with an employee outside the protected class, i.e. under 40 years old. Id. Rather, the Supreme Court held that to create an inference of age discrimination with respect to the fourth element, plaintiff must show that he was replaced with someone who was "substantially younger." Id. at 313.

that plaintiff cannot show the fourth element, i.e. that it hired a substantially younger person to replace him. Specifically, defendant states that it replaced plaintiff with Mary Johnson, who was three years and nine months younger than plaintiff, and that the age difference between plaintiff and Johnson is insufficient to establish a prima facie case.[20]

The Tenth Circuit has ruled that a two year age difference is "obviously insignificant" for purposes of the fourth element of the prima facie case. Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1166 (10th Cir. 2000). The Tenth Circuit has not specifically addressed the issue whether individuals who are between three and four years younger than plaintiff are "substantially younger," but most circuit courts which have addressed the issue have held that they are not. See Grosjean v. First Energy Corp., 349 F.3d 332, 340 (6th Cir. 2003) (absent direct evidence that employer considered age significant, difference of six years or less insufficient), cert. denied, 541 U.S. 1010 (2004); Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000) (three-year difference insufficient); Radue v. Kimberly-Clark Corp., 219 F.3d 612, 619 (7th Cir. 2000) (to satisfy substantially younger requirement, replacement must be at least ten years younger

---

[20]     Because Osco contends that it did not replace plaintiff, he argues that the Court should analyze his claim as a reduction in force (RIF) case. See Plaintiff's Response (Doc. #87) at 62. Plaintiff relies on defendant's position that plaintiff cannot state a prima facie case of age discrimination because he cannot show that he was replaced. See Plaintiff's Response (Doc. #87) at 62 (citing Pretrial Order (Doc. #66) ¶ 7(a)(4)). Plaintiff ignores defendant's other defense, that plaintiff cannot present evidence that it replaced him with someone who was substantially younger. See Pretrial Order (Doc. #66) ¶ 7(a)(5). In the pretrial order, Osco does not deny replacing plaintiff -- it simply claims that plaintiff has no evidence that Osco replaced him or replaced him with a substantially younger employee.

To satisfy the fourth element of a prima facie case of age discrimination in the context of a RIF, plaintiff must simply present some evidence that the employer intended to discriminate in reaching its RIF decision. Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1225 (10th Cir. 2006) (citing Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1137 (10th Cir.), cert. denied, 531 U.S. 876 (2000)). Plaintiff has not explained how the Court should apply this standard under the circumstances of this case.

unless plaintiff presents evidence that employer considered age to be significant factor); Schiltz v. Burlington N.R.R., 115 F.3d 1407, 1413 (8th Cir. 1997) (five years insufficient); cf. O'Connor, 517 U.S. at 312 (replacement of 68 year-old with 65 year-old is "very thin evidence;" suggesting that three-year difference is insignificant). But cf. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (five years sufficient); Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997) (three years sufficient). District courts in the Tenth Circuit have also largely held that a difference of four years is insufficient. See Perry v. St. Joseph Reg. Med. Ctr., 110 Fed. Appx. 63, 67 (10th Cir. 2004) (affirming decision that seven years is insufficient without specifically addressing issue); Kitchen v. Burlington N. & Santa Fe Ry. Co., 298 F. Supp.2d 1193, 1200-01 (D. Kan. 2004) (VanBebber) (six years insufficient); Housley v. Boeing Co., 177 F. Supp.2d 1209, 1215 (D. Kan. 2001) (Lungstrum) (four to five years insufficient).[21] The Court substantially agrees with the reasoning of these cases. Plaintiff's evidence that his replacement was three years and nine months younger is therefore insufficient to show that his replacement was "substantially younger" so as to satisfy the fourth element of his prima

---

[21]     Likewise, district courts in other circuits have held that a three- or four-year difference is not sufficient to create an inference of age discrimination. Steward v. Sears, Roebuck & Co., 2006 WL 1648979, at *18 (E.D. Pa. June 13, 2006) (five years insufficient); LeDoux v. AGL Res., Inc., 2006 WL 2246182, at *9 (N.D. Ga. Aug. 4, 2006) (47 year-old not "substantially younger" than 51 year-old); DeBord v. Washington County Sch. Bd., 340 F. Supp.2d 710, 715-16 (W.D. Va. 2004) (seven years insufficient when combined with weak evidence of age discrimination); Davila Rivera v. Caribbean Refrescos, Inc., 2004 WL 1925477, at *13 (D. Puerto Rico May 26, 2004) (five years insufficient). But see Porter v. Exxon Mobil Corp., 246 F. Supp.2d 615, 619-20 (S.D. Tex. 2003) (deeply troubled that age claim can be based upon slight difference of three years, but difference is not insufficient as matter of law); Newbury v. Nat'l Press Club, Inc., 1997 WL 664589, at *3 (D.D.C. Aug. 26, 1997) (five year difference not substantial).

facie case.[22]

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion For Summary Judgment</u> (Doc. #63) filed April 14, 2006 be and hereby is **SUSTAINED in part**. Defendant's motion is sustained as to plaintiff's age discrimination claim. Defendant's motion is overruled as to plaintiff's reverse sex discrimination claim.

Dated this 11th day of October, 2006 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Court

---

[22]     Even under the more relaxed standard used for a prima facie case in non-age cases – which requires plaintiff to prove that adverse action occurred under circumstances giving rise to an inference of discrimination, <u>see</u> <u>Howard v. Garage Door Group, Inc.</u>, 136 Fed. Appx. 108, 112 (10th Cir. 2005) (citation omitted) –  plaintiff has not shown such circumstances. Hunstiger, who made the final decision to terminate plaintiff's employment, was some six years older than plaintiff. <u>See</u> <u>Fairchild v. Forma Scientific, Inc.</u>, 147 F.3d 567, 572 (7th Cir. 1998) (plaintiff has "tough row to hoe" when fired by person older than himself). In addition, plaintiff's attempted use of statistics is insufficient because he presents no evidence of any significant difference between the treatment of older and younger management employees and he does not properly account for nondiscriminatory explanations. <u>See</u> <u>Rea v. Martin Marietta Corp.</u>, 29 F.3d 1450, 1456 (10th Cir. 1994).